**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SALVATORE MILAZZO and JANET MILAZZO, individually and derivatively on behalf of WINDY CITY LIMOUSINE COMPANY, LLC, an Illinois limited liability company, WINDY CITY LIMOUSINE MANAGER, LLC, an Illinois limited liability company, and JKS LIMOUSINES, LLC, an Illinois limited liability company, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | |
| WINDY CITY LIMOUSINE COMPANY, LLC, an Illinois limited liability company, WINDY CITY LIMOUSINE MANAGER, LLC, an Illinois limited liability company, JKS LIMOUSINES, LLC, an Illinois limited liability company, WINDY CITY BUS LEASING, LLC, an Illinois limited liability company, and GEORGE JACOBS, STANTON SUBECK and LEONARD H. SHERMAN d/b/a LHS VENTURES LIMITED PARTNERSHIP, individually, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | ) | |

**COMPLAINT FOR**
**SECURITIES FRAUD AND OTHER RELIEF**

Salvatore ("Sal") and Janet Milazzo ("Janet") (collectively, the "Milazzos"), individually and derivatively on behalf of Windy City Limousine Company, an Illinois limited liability company ("Windy City Limo"), Windy City Limousine Manager, LLC, an Illinois limited liability company ("Windy City Manager"), and JKS Limousines, LLC, an Illinois limited liability company ("JKS"), by their attorneys, Margaret A. Gisch, Matthew C. Wasserman and Brianna L. Golan of the law firm Golan & Christie LLP, as their Complaint for Securities Fraud

and Other Relief against Windy City Limo, Windy City Manager, JKS, Windy City Bus Leasing, LLC, an Illinois limited liability company ("WCBL"), George Jacobs ("Jacobs"), Stanton Subeck ("Subeck") and Leonard H. Sherman d/b/a LHS Ventures Limited Partnership ("Sherman") (collectively, the "Defendants"), state as follows:

## <u>NATURE OF THE CLAIMS</u>

1.      The Milazzos and Jacobs have spent their careers building and operating successful limousine companies in the Chicagoland area. After competing for several years, Sal and Jacobs began working together at Carey International, Inc. ("Carey"). In late 2005, after being terminated by Carey, Jacobs wanted to start a new limousine company in Chicago to capitalize on a fertile marketplace. Jacobs, however, was contractually prohibited from competing with Carey, so he commissioned Sherman and Subeck to prepare and circulate a PPM for the purpose of raising capital for the new business. Sherman, Subeck and Jacobs then solicited Sal, among others, to invest in the new venture.

2.      Drawing upon the trust and confidence he placed in Jacobs based on their years of working together, Sal (and in turn, Janet) agreed to leave Carey, join and invest in the new company, Windy City Limo. Over the course of four (4) years, in reliance upon the PPM and Jacobs' numerous misrepresentations and omissions, the Milazzos' invested over $500,000.00 in Windy City Limo. The PPM, however, was misleading and inaccurate, and ultimately, not followed. Not realizing the misrepresentations and omissions in the PPM, Sal and Janet worked for Windy City Limo as Vice President and Controller, respectively while Jacobs was primarily involved in marketing the company and had limited involvement in the day-to-day operation of the company.

3.      During their employment, Sal and Jacobs disagreed about certain strategic business decisions, specifically the license and use of certain buses that were poorly made and dangerous to use. Unbeknownst to the Milazzos, Jacobs, Sherman and Subeck started a new company to supply these same dangerous buses, WCBL, and insisted on Windy City Limo using these buses. WCBL was organized solely to service Windy City Limo, but was never disclosed as a corporate opportunity, nor were the shareholders of Windy City Limo given an opportunity to invest in WCBL.  Ultimately, Jacobs, Sherman and Subeck used WCBL to siphon funds from Windy City Limo and encumber Windy City Limo's assets.  Jacobs also unilaterally caused Windy City Limo to continue using the BCI Buses, even after the Federal Department of Transportation ("DOT") ordered Windy City Limo to remove the buses from the fleet due to serious violations that jeopardized public safety – all over Milazzos' vehement objections.

4.      The Milazzos recently learned that Windy City Limo was not organized in the manner represented in the PPM. Rather, Jacobs organized Windy City Limo and its manager, Windy City Manager, so that he (Jacobs) held complete and unfettered control of both companies.  Jacobs has and continues to run the companies without regard to legitimate objections, to the detriment of the company's reputation and value, and at the risk of public safety.  To date, Jacobs has caused Windy City Limo to have a greater percentage of DOT investigations and out of service vehicles than the national average when compared to other commercial carriers.

5.      Additionally, Jacobs, Sherman and Subeck's conduct renders the companies' operating agreements unconscionable and the agreements should be disregarded by this Court. Windy City Limo should be ordered to buy-out the Milazzos interests for fair value, and should be awarded damages due to Jacobs, Sherman and Subeck's intentional violation of the Securities

Exchange Act and the Illinois Limited Liability Company Act. Alternatively, Windy City Limo, Windy City Manager and JKS should be judicially dissolved and wound up, and the assets of the companies should be sold and distributed to the owners. This Court should appoint a third-party manager or a receiver to operate the companies, instead of Jacobs, to ensure the public safety and facilitate the buy-out of the Milazzos interests, or the dissolution and winding up of the companies.

6. Defendants' conduct gives rise to the following claims:

    a. Count I for Securities Fraud;

    b. Counts II through V for Declaratory Judgment, Purchase of Membership Interests or, alternatively, Judicial Expulsion and Dissolution, with respect to Windy City Limo;

    c. Counts VI through VII for Declaratory Judgment, Purchase of Membership Interests or, alternatively, Judicial Expulsion and Dissolution, with respect to Windy City Manager;

    d. Counts VIII and IX for Declaratory Judgment and Purchase of Membership Interests with respect to JKS;

    e. Count X for Inspection of Business Records of Windy City Limo, Windy City Manager and JKS; and

    f. Count XI for Unjust Enrichment with respect to the RBS Guaranty, the Lease Guaranty and the Lease Differential (defined below).

## **PARTIES**

7. Sal is an individual residing in Illinois. Sal owns Class A membership interests in Windy City Limo. Sal also owns Class A and Class B membership interests in Windy City Manager.

8. Janet is an individual residing in Illinois. Janet owns Class B membership interests in Windy City Manager. Janet also owns one-third (1/3) of the membership interests in JKS.

9.      Jacobs is an individual residing in Hinsdale, Illinois. Jacobs owns Class A membership interests in Windy City Limo.  Jacobs also owns Class A and Class B membership interests in Windy City Manager.  Jacobs is the sole manager of Windy City Manager.

10.     Windy City Limo is an Illinois limited liability company with its principal place of business located in Elmhurst, Illinois.

11.     Windy City Manager is an Illinois limited liability company with its principal place of business located in Elmhurst, Illinois.

12.     JKS is an Illinois limited liability company with its principal place of business located in Chicago, Illinois.

13.     WCBL is an Illinois limited liability company with its principal place of business located in Chicago, Illinois.

14.     Stanton Subeck is an individual residing in Glenview, Illinois. Subeck owns Class A membership interests in Windy City Limo.  Subeck also owns 8% of the Class A, and 1.091% of the Class B, membership interests in Windy City Manager.   Subeck also owns Class A membership interests and/or controls WCBL.

15.     Leonard Sherman is an individual residing in Chicago, Illinois.   Sherman conducts business in the name of LHS Ventures Limited Partnership.  Sherman owns Class A membership interests in Windy City Limo.  Sherman also owns 8% of the Class B membership interests in Windy City Manager.   On information and belief, Sherman also owns Class A membership interests in WCBL.

## **VENUE AND JURISDICTION**

16.     This is an action for violations arising under Section 10(b) of the Securities Exchange Act, 15 U.S.C. §78j(b), *et seq*., and Rule 10b-5 promulgated thereunder, 17 C.F.R.

§240.10b-5, and Illinois common law claims for declaratory judgment, violation of the Illinois Limited Liability Company Act, 805 ILCS 180/35-1 *et seq*., breach of fiduciary duty and unjust enrichment.

17.     Subject matter jurisdiction and venue against the Defendants are proper pursuant to 28 U.S.C. §§1331 and 1343.

18.     Supplemental jurisdiction over the state causes of action against the Defendants is proper pursuant to 28 U.S.C. §1367.

19.     Venue is proper in this district pursuant to Section 27 of the Securities Exchange Act, 15 U.S.C. §78(aa), because the acts and transactions constituting violations of the Securities Exchange Act occurred in this district.  Venue is proper pursuant to 28 U.S.C. §1391(b) because Plaintiffs' claims arise in this district.

**FACTS COMMON TO ALL COUNTS**

**I.      Background on the Parties' Relationships**

20.     In 1991, Sal started a limousine company called My Chauffeur located in the northwest suburbs of Chicago.  At Sal's direction and management over the following eight (8) years, My Chauffeur became one of the fastest growing limousine companies in the Chicago area, ultimately exceeding over $10,000,000.00 in annual sales.

21.     During this same period, Jacobs owned a competing limousine company called the American Limousine Company.

22.     In or around 1998, Carey, a global leader in chauffeured services and ground transportation management, acquired American Limousine Company.  For the following five (5) years, Jacobs was employed by Carey as a business consultant.

23.     Shortly after acquiring American Limousine Company, Carey acquired My Chauffeur and merged its operations with the operations of American Limousine Company. Thereafter, Sal was named Regional Vice President of Carey and was the primary person responsible for managing the operations of the merged entity, called My Chauffeur. Janet also joined Carey, ultimately becoming the Regional Comptroller for Carey's Chicago-based operations.

24.     Jacobs reported directly to Sal throughout their employment with Carey. During this time, Sal and Jacobs developed a strong working and personal relationship.

25.     In early 2005, Carey fired Jacobs.

26.     In or about August of 2005, Jacobs began to solicit Sal to start a new limousine company in the Chicago area. At the time, Jacobs was bound by an Executive Management and Non-Competition Agreement (the "Carey – Jacobs Non-Compete") that prohibited Jacobs, for a period of two (2) years following his termination, from soliciting Carey's customers and employees, and from affiliating with a competing business.

27.     Due to Sal's operational knowledge and expertise, Jacobs would not have started a new limousine business without Sal's agreement and participation.

## II.     Windy City Limo commences operations

28.     In October of 2005, pursuant to Jacobs' request and direction, Subeck and Sherman, formed Two-S Group, LLC ("Two-S Group") for the purpose of raising capital for a new limousine business. Subeck and Sherman were the sole members and managers of Two-S Group.

29.     Subeck and Sherman had no experience in the chauffeur industry prior to working with Jacobs to raise the initial capital for Windy City Limo. Presumably, Jacobs asked Subeck

and Sherman to set up the new limousine company because he was barred from doing so himself pursuant to the Carey – Jacobs Non-Compete.

30.     Given their lack of knowledge and experience, Subeck and Sherman served as a cover for Jacobs, but this fact was not disclosed to the Milazzos.

31.     In January of 2006, Two-S Group commenced operations under the name of, and later changed its name to, Windy City Limo.

32.     At or about the same time that Windy City Limo commenced operations, Jacobs organized Windy City Manager.  Windy City Manager is a manager-managed limited liability company.  Jacobs is the sole manager.

33.     Jacobs was named President of Windy City Limo.  At the beginning, Jacobs had limited involvement in  the day-to-day operations of the business.

34.     Jacobs named Sal as Vice President of Windy City Limo. As with their roles at Carey, Sal was the primary person responsible for the day-to-day management and operation of Windy City Limo's business.

35.     Jacobs named Janet as Controller of Windy City Limo.  Janet's primary responsibility was to maintain the company's books and records.  Janet also performed various duties related to office management, employee relations and benefits.

36.     Since inception, Jacobs knew that he would be required to raise significant capital for Windy City Limo to purchase vehicles and conduct operations.

III.     **Formation of JKS**

37.     In March of 2006, Jacobs formed JKS Limousines, LLC ("JKS") for the purpose of owning, registering and leasing vehicles to Windy City Limo for use in the operation of the business.  The membership interests in JKS were vested in Janet, Kathy Kahne ("Kahne") and

Stacy Jacobs ("Stacy," Jacobs' wife). Jacobs intended to register JKS with the State of Illinois and the City of Chicago as a woman-owned-business enterprise.

38. Around that same time, Jacobs required that Janet, Stacy and Kahne execute an Operating Agreement with respect to the ownership and operation of JKS (the "JKS Operating Agreement"). A copy of the JKS Operating Agreement is attached hereto as **Exhibit 1**.

39. Janet was not (nor, likely, were the other JKS owners) provided an opportunity to negotiate any of the terms of, or seek legal counsel with respect to, the JKS Operating Agreement. The sole purpose of JKS was to buy and lease vehicles and to provide drivers for Windy City Limo. The relationship between JKS and Windy City Limo was memorialized in the JKS Letter Agreement (defined below).

40. Despite having no ownership or management role in JKS, Jacobs exercised complete control with respect to JKS's operations and management.

41. From March through May of 2006, using money contributed by the Milazzos, JKS acquired fifteen (15) new vehicles at a cost of approximately $500,000.00. Jacobs required JKS to obtain his approval for each vehicle acquisition.

**IV.    Raising Capital for Windy City Limo – The PPM and the Offering**

42. On May 10, 2006, pursuant to Jacobs' request and direction, Subeck and Sherman drafted and began circulating a Private Placement Memorandum and Disclosure Document (the "PPM") for the purpose of raising capital on behalf of Windy City Limo (the "Offering"). A copy of the PPM is attached hereto as **Exhibit 2**.

43. Subeck, Sherman and Jacobs, individually and through Windy City Manager, had ultimate authority over the PPM and the Offering, including but not limited to, final say with respect to:

    a.      all statements contained in the PPM and the attendant subscription documents;

    b.      whether and how to circulate the PPM;

    c.      who would be provided an opportunity to subscribe pursuant to the Offering;

    d.      whether each potential investor would be accepted as a member by Windy City Limo;

    e.      how the proceeds from the Offering would be maintained and utilized by Windy City Limo;

    f.      how Windy City Limo would account for each subscription;

    g.      when the Offering Period (defined below) would begin and end; and

    h.      what compensation would be paid to Sherman and Subeck in connection with the Offering.

44.      The PPM included the following representations:

    a.      the offering period was from May 10, 2006 to June 30, 2006, unless extended by Windy City Manager to a date not later than August 31, 2006;

    b.      Windy City Limo is managed by Windy City Manager;

    c.      Windy City Limo sought to raise a minimum of $2,000,000 and a maximum of $6,000,000 in Class A Membership Interests;

    d.      "[t]he minimum purchase per investor is one Unit for $100,000, although the Manager has the discretion to accept subscriptions for half-Units;"

    e.      Windy City Manager owns all of the Class B membership interests in Windy City Limo;

    f.      Subeck and Sherman paid for the legal fees and received compensation in connection with the PPM;

    g.      Subeck and Sherman would be paid a commission in the amount of 4% of all capital raised pursuant to the PPM;

    h.      the proceeds from the Offering will be used in the "development, expansion and general operations" of Windy City Limo, including to purchase equipment, pay operating expenses and to acquire existing limousine companies; and

i.    "Members have no right to vote to remove [Windy City Manager]. However, pursuant to the Act, if [Windy City Manager] willfully and materially breaches its fiduciary duty to the Company or its Members or engages in wrongful conduct that adversely and materially affects the Company's business, the Members may obtain its judicial expulsion."

45.    Subeck and Sherman are not licensed broker-dealers, did not act as sales agents on behalf of any licensed broker-dealer, and were not otherwise entitled to receive commissions with respect to the subscriptions made pursuant to the PPM.

46.    Subeck, Sherman and Jacobs failed to retain a qualified financial advisor to assist Windy City Limo with respect to, and ensure compliance with, the PPM.

47.    Despite representing that the offering period would end no later than August 31, 2006, the offering period remained opened until at least June of 2010. The period of time from May of 2006 through at least June of 2010, during which Subeck, Sherman and Jacobs accepted subscriptions for membership units of Windy City Limo, is referred to herein as the "Offering Period."

48.    On information and belief, the Offering Period remains open.

49.    On information and belief, Subeck, Sherman and Jacobs, have not, either individually or through Windy City Manager, filed a Form D with the U.S. Securities Exchange Commission or the Illinois Securities Department indicating that the Offering Period is now closed.

50.    During the Offering Period and pursuant to the PPM, Subeck, Sherman and Jacobs, individually and through Windy City Manager:

a.    repeatedly approved and accepted subscriptions for amounts equal to less than half-Units (<$50,000.00);

b.    caused Windy City Limo to pay commissions to Subeck and Sherman in the amount of 4% of each subscription;

     c.     raised a total of $4,852,500.02 in capital for use in the operation of Windy City Limo;

     d.     reduced the value of Windy City Limo by causing Windy City Limo to execute the RBS Guaranty (defined below) and the Lease Guaranty (defined below); and

     e.     reduced the income of Windy City Limo by paying higher lease rates to WCBL than the lease rates paid to JKS.

51.     In connection with the Offering and without disclosing the same to Sal or Janet, Subeck, Sherman and Jacobs, individually and through Windy City Manager, failed to:

     a.     ensure and disclose that each investor was properly accredited;

     b.     ensure that each investor followed the "Subscription Procedures" described in the PPM;

     c.     ensure that each investor executed a consent to be bound by the terms of Windy City Limo's Amended Operating Agreement;

     d.     ensure that each investor paid at least the minimum purchase price for one Unit in the amount of $100,000.00;

     e.     close the offering no later than August 30, 2006;

     f.     identify each investor that was approved by the Manager to purchase half-Units;

     g.     ensure that those investors approved by the Manager to purchase half-Units paid an amount equal to $50,000.00;

     h.     file a Form D, Notice of Sale of Securities, within fifteen (15) days of the first sale of securities pursuant to the Offering;

     i.     properly or adequately account for each subscription made pursuant to the Offering; and

     j.     otherwise manage the Offering in a manner consistent with that of a registered broker-dealer.

52.     During the Offering Period, Sal and Janet made numerous contributions to Windy City Limo pursuant to and in reliance upon the PPM in excess of $500,000.00.

## V.     The JKS Letter Agreement

53.     On November 1, 2006, Jacobs caused Windy City Limo and JKS to enter into a letter agreement concerning Windy City Limo's use of vehicles owned by, and drivers employed by, JKS (the "JKS Letter Agreement").  A copy of the JKS Letter Agreement is attached hereto as **Exhibit 3**.

54.     The JKS Letter Agreement provided, among other things, that:

    a.     Windy City has guaranteed a $500,000.00 line of credit established between JKS and Bank of Hinsdale (the "JKS Line of Credit");

    b.     the JKS Line of Credit will be used to purchase vehicles to then be leased to Windy City Limo for use in the operation of the limousine business;

    c.     Windy City Limo was to lend money to JKS to purchase vehicles;

    d.     Windy City Limo will pay JKS "an amount equal to the direct cost of the vehicles and drivers…;"

    e.     Windy City Limo "shall be the exclusive lessee of vehicles owned by JKS;" and

    f.     All profits generated by JKS, either from lease payments made by Windy City Limo or through the sale of vehicles, shall be used "to repay any then outstanding balances on the [JKS] Line of Credit or loans from the Company."

55.     From November of 2006 through early 2010, pursuant to Jacobs' express direction, JKS purchased buses and other vehicles from Bus & Coach International Pty Ltd., an Australian owned and operated bus and coach manufacturing company ("BCI," the "BCI Vehicles" or the "BCI Buses," as applicable).

56.     Jacobs required that JKS obtain his approval before purchasing or leasing any buses or vehicles for use in the operation of the business pursuant to the JKS Letter Agreement.

57.     Pursuant to the JKS Letter Agreement and at Jacobs' direction, JKS leased the BCI Vehicles to Windy City Limo for use in the operation of the limousine business.  Although

not intended at the time of the JKS Letter Agreement, the fleet of vehicles owned by JKS and leased to Windy City Limo ultimately included more BCI Buses than any other type of vehicle.

58.     Shortly after their purchase, Windy City Limo began experiencing significant problems with the BCI Buses.  The problems with the BCI Buses included, but are not limited to:

a.     transmission malfunctions causing the vehicles to lunge forward or failure to turn properly, thereby jeopardizing public safety;

b.     defogger malfunctions causing the driver of the vehicle to be unable to see the road;

c.     loss of power;

d.     electrical and audio issues;

e.     windows leaking;

f.     windows unable to fully close;

g.     air conditioning and heating not functioning properly; and

h.     otherwise failing to comply with the DOT regulations for operation of commercial vehicles.

59.     As the mechanical issues, public safety problems and customer complaints continued to mount, the Milazzos, in addition to numerous drivers employed by JKS, began demanding that Windy City Limo and JKS cooperate in the return, or sale, of the BCI Buses. The Milazzos maintained that the public safety issues and customer complaints were having an adverse impact on the profitability, and significantly damaging the public reputation, of Windy City Limo and JKS, in addition to putting customers and the public at risk.

60.     In 2010, rather than heeding the Milazzos' warnings and the clear precedent that the BCI Buses were dangerous and inadequate to service Windy City Limo's business, Jacobs unilaterally (as the sole manager of Windy City Manager) commenced negotiations with BCI to acquire eight (8) additional BCI Buses for $150,000.00 each.

61.     Sal strongly opposed purchasing any additional BCI Buses based on the numerous mechanical problems historically experienced by Windy City Limo.  Sal was also extremely concerned about the safety of operating the BCI Buses.

62.      Although Sal made numerous written and oral objections, he had no authority to stop the purchases or operation of the defective and dangerous BCI Buses.

**VI.     Jacobs, Subeck and Sherman organize WCBL, cause Windy City Limo to guaranty WCBL's debt to RBS and begin skimming profits from the vehicle leases.**

**A.      Organization of WCBL**

63.     In January of 2010, Jacobs and Subeck formed WCBL for the purpose of raising capital to purchase (despite Sal's objections) additional BCI Buses for use in the operation of Windy City Limo.

64.     On July 7, 2010,  WCBL entered into a Master Lease Agreement with RBS Asset Finance, LLC (the "RBS Master Lease Agreement").  At that same time, pursuant to RBS's requirement, also unbeknownst to Sal and Janet, Jacobs caused JKS to execute a Guaranty of WCBL's obligations under the Master Lease Agreement (the "RBS Guaranty").  A copy of the RBS Guaranty is attached hereto as **Exhibit 4**.

65.     The RBS Guaranty:

a.      created a contingent liability for Windy City Limo and should have been disclosed to potential investors pursuant to the PPM and throughout the Offering; and

b.      has a negative effect on the value of ownership interests in Windy City Limo and Windy City Manager, including but not limited to the ownership interests held by the Milazzos.

66.     On information and belief, the purpose of the RBS Master Lease Agreement and RBS Guaranty was for WCBL to obtain the necessary funds to purchase BCI Buses for use in the operation of Windy City Limo's business.

67.     On information and belief, RBS funded seventy-five percent (75%) of the purchase price for the BCI Buses purchased by WCBL.

68.     On information and belief, Jacobs, Subeck and Sherman created and circulated a Private Placement Memorandum to raise capital for WCBL through the sale of Class A membership units in the company.

69.     Jacobs, Subeck and Sherman, either individually or through Windy City Manager, never disclosed their ownership in, or offered Windy City Limo, Sal or Janet an opportunity to invest in, WCBL.

70.     On information and belief, Jacobs, Subeck and Sherman purchased Class A membership interests in WCBL, either individually or through entities with which they are affiliated or control.

**B.      Equipment Provision Agreement and the Lease Differential**

71.     Also on or about July 7, 2010, in connection with the financing provided by RBS, Jacobs caused Windy City Limo, JKS and WCBL to enter into an Equipment Provision Agreement.  A copy of the Equipment Provision Agreement is attached hereto as **Exhibit 5**.

72.     The stated purpose of the Equipment Provision Agreement was for JKS to lease the BCI Buses purchased by WCBL, for use in the operation of Windy City Limo's business.

73.     The Equipment Provision Agreement provides, among other things, that:

a.      WCBL shall have the first opportunity to supply vehicles, whether through lease or purchase, for use in the operation of Windy City Limo;

b.      JKS shall execute a sublease with WCBL (referred to as an "Assumption Agreement") and assume all obligations of WCBL with respect to each vehicle leased by WCBL (referred to collectively as "WCBL Equipment Leases");

c.      JKS shall pay a monthly lease rate equal to the amount paid by WCBL pursuant to the WCBL Equipment Leases, plus 0.25% applied to the total cost of the vehicle;

d.    if JKS is unable or unwilling to execute an Assumption Agreement with respect to each new vehicle, than Windy City Limo shall execute a sublease directly with WCBL;

e.    chauffeur drivers provided by JKS shall continue to be used to service Windy City Limo's customers;

f.    JKS shall be restricted from making any distributions to its members unless all amounts due and owing to WCBL or Windy City Limo are satisfied; and

g.    the Equipment Provision Agreement shall terminate if WCBL is unable to sell at least 25 Class A membership units.

74.    Contemporaneously, and unbeknownst to the Milazzos at the time, Jacobs unilaterally caused Windy City Limo to execute a Lease Guaranty pursuant to which Windy City Limo guaranteed JKS's obligations under the Equipment Provision Agreement (the "Lease Guaranty"). A copy of the Lease Guaranty is attached hereto as **Exhibit 6**.

75.    The Lease Guaranty:

a.    created a contingent liability for Windy City Limo and should have been disclosed to potential investors pursuant to the PPM and throughout the Offering; and

b.    has a negative effect on the fair value of ownership interests in Windy City Limo and Windy City Manager, including but not limited to the ownership interests held by Sal and Janet.

76.    Jacobs did not provide JKS with an opportunity to purchase or lease new vehicles and continue performing pursuant to the JKS Letter Agreement, and instead directed and required that JKS enter into the Equipment Provision Agreement with WCBL.

77.    The monthly lease payments made by Jacobs on behalf of Windy City Limo to WCBL under the Equipment Provision Agreement were greater than the direct cost of the vehicles purchased by JKS under the JKS Letter Agreement (the "Lease Differential").

78.     The sole purpose of creating WCBL was to add another layer of expense to Windy City's bus leasing, the Lease Differential, which would then be split as profit amongst the owners of WCBL.

79.     From July of 2010 through the present, pursuant to the RBS Master Lease Agreement, WCBL leased vehicles for use in the operation of Windy City Limo.  During that time:

    a.     the parties never executed any Assumption Agreements;

    b.     JKS was never provided copies of the WCBL Equipment Leases;

    c.     JKS continued to provide drivers to service Windy City Limo's customers;

    d.     the Milazzos repeatedly requested that WCBL provide copies of the WCBL Equipment Leases;

    e.     the Milazzos repeatedly demanded that the BCI Buses purchased by WCBL be removed from Windy City Limo's fleet due to numerous mechanical and public safety problems;

    f.     Jacobs unilaterally caused Windy City Limo to continue operating the BCI Buses despite not being in compliance with DOT regulations and/or in direct violation of DOT Orders to cease operating the defective buses;

    g.     the Milazzos repeatedly requested payoff amounts for the BCI Buses purchased by WCBL so that the buses could be sold to a third-party and removed from Windy City Limo's fleet;

    h.     in January of 2014, WCBL provided lease payoff amounts that exceeded the aggregate amount of remaining monthly lease payments;

    i.     Windy City Limo sustained significant losses due to high monthly lease payments and increased repair costs from the mechanical and public safety problems with the BCI Buses leased by WCBL;

    j.     Jacobs unilaterally required that Windy City Limo continue operating the BCI Buses despite the significant safety issues with the buses and the DOT investigations (see below); and

    k.     Jacobs unilaterally caused Windy City Limo to continue making monthly lease payments to WCBL for the BCI Buses far in excess of the amounts paid by Windy City Limo pursuant to the JKS Letter Agreement.

**VII.    Jacobs insists on running buses despite DOT shut down**

80.    In the summer of 2012, the DOT opened an investigation into the BCI Buses being operated by Windy City Limo.  The DOT was specifically concerned that Windy City Limo was failing to ensure that the buses and the drivers remained in compliance with the DOT's regulations and that the defective buses were placing the public safety at risk.

81.    On October 21, 2012, the DOT required Windy City Limo to remove the BCI Buses from the road and refrain from servicing customers until the buses were brought into compliance with the DOT's regulations.

82.    Sal and Janet insisted that the BCI Buses be immediately removed from the fleet and brought into compliance.

83.    Despite the DOT's requirement, and Sal and Janet's insistence, Jacobs refused to remove the buses and unilaterally caused Windy City Limo to continue using the buses to service customers.

84.    Between October 21, 2012 and December 5, 2012, Windy City Limo performed certain repairs to the BCI Buses.

85.    On December 5, 2012, the DOT granted Windy City Limo a conditional right to resume operation of the BCI Buses pending further inspections and continued compliance with the DOT's regulations.

86.    Jacobs never informed the DOT that Windy City Limo operated the buses in violation of the DOT's orders.

87.    Windy City Limo lost customers, including the Big Ten Conference, as a direct result of the reduced safety rating given by the DOT to Windy City Limo due to the problems with the BCI Buses.

88.     To date, the DOT continues to regularly investigate Windy City Limo.  By continuing to operate defective and dangerous BCI Buses, Jacobs has exposed Windy City Limo to a greater number of DOT investigations and out of service vehicles than the national average when compared to other commercial carriers.

## VII.    Sal and Janet's Termination from Windy City Limo

89.     In late 2013, the tension increased between the Milazzos, on the one hand, and Jacobs, on the other hand, with respect to Windy City Limo's continued use of the BCI Buses leased from WCBL and continued payment of increased lease rates to WCBL pursuant to the Equipment Provision Agreement.

90.     On February 10, 2014, Jacobs demanded that Sal refrain from any further efforts to sell or otherwise dispose of the BCI Buses.  Jacobs threatened to terminate Sal if he refused to do so.

91.     On February 14, 2014, Jacobs terminated the Milazzos from their employment with Windy City Limo.[1]

## CAUSES OF ACTION

### COUNT I
### SECURITIES FRAUD
**(15 U.S.C. § 78j(b), *et. seq*.)**
**(*The Milazzos v. Jacobs, Sherman and Subeck*)**

92.     The Milazzos reallege and incorporate paragraphs 1 through 91 as though fully stated herein.

93.     The Securities Act of 1933, 15 U.S.C. § 78j(b) states that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or the mails … (b) [t]o use or employ, in connection with the purchase or sale of any

---

[1] The parties are currently engaged in litigation related to the termination of Sal and Janet's employment and numerous other employment-related disputes, which are not relevant to the securities and ownership claims.

security registered on a national securities exchange or not so registered
… any manipulative or deceptive device or contrivance in the public
interest or for the protection of investors.

94.     The PPM contained the following false and misleading statements, among others

(collectively, the "Misrepresentations"):

     a.      Windy City Limo was initially capitalized in the amount of $500,000.00
contributed in cash through the sale of Class A Membership interests;

     b.      as of the opening of the Offering Period, Windy City Manager was the
manager of Windy City Limo;

     c.      the Offering Period would end no later than August 31, 2006;

     d.      the Manager would accept subscriptions in increments of one Unit for
$100,000.00 or half-Units for $50,000.00; and

     e.      the Members could seek judicial removal of Windy City Manager.

95.     Jacobs, Sherman and Subeck, individually and through Windy City Manager,

drafted and circulated the PPM in reckless disregard to the truthfulness of the statements

contained therein.

96.     The Misrepresentations were false because:

     a.      Windy City Limo did not sell Class A membership interests prior to
issuing the PPM;

     b.      As of the opening of the Offering Period, Sherman and Subeck were the
sole members and managers of Two-S Group, at the time doing business
as Windy City Limo;

     c.      Windy City Manager did not become the manager of Windy City Limo
until September of 2006;

     d.      Windy City Manager accepted numerous subscriptions in increments of
amounts less than $50,000.00; and

     e.      the Windy City Limo Operating Agreement prohibited removal of the
manager other than by unanimous written direction of the Class A
members.

97.     The Milazzos did not participate in drafting or circulating the PPM.

98.     The Milazzos did not participate in the Offering except to the extent that they made subscriptions to Windy City Limo in reasonable reliance upon the PPM.

99.     The Milazzos did not possess any power or ability to control the specific content of the PPM or any transactions entered into by Windy City Limo pursuant to the PPM or in connection with the Offering.

100.     In connection with the Offering, Jacobs, Sherman and Subeck, individually and through Windy City Manager, failed to disclose the following material facts, among others (collectively, the "Omissions"):

   a.     Subeck and Sherman are not licensed broker-dealers, did not act as sales agents on behalf of any licensed broker-dealer, and were not otherwise entitled to receive a commission with respect to the subscriptions made pursuant to the PPM;

   b.     Windy City Limo failed to retain a qualified financial advisor to assist with respect to, and ensure compliance with, the PPM and the Offering;

   c.     they planned to:

      i.     permit the Offering Period to extend far beyond August 31, 2006;

      i.     approve and accept subscriptions for amounts less than $50,000.00;

      ii.     permit Jacobs to exercise complete autonomy with respect to the operation of Windy City Limo, Windy City Manager and JKS;

      iii.     cause Windy City Limo and JKS to breach their respective obligations under the JKS Letter Agreement;

      iv.     encumber the assets of Windy City Limo;

      v.     guaranty obligations of WCBL, an external entity;

      vi.     organize and invest in WCBL to the exclusion of and at a cost to Windy City Limo members;

      vii.     personally benefit from the monthly lease payments made by Windy City Limo to WCBL pursuant to the Equipment Provision Agreement;

      viii.    operate BCI Buses that failed to conform to DOT standards;

      ix.    operate BCI Buses in direct violation of a DOT direction to remove the buses from service until being brought into compliance with DOT standards; and

  d.    they were not qualified, were not able, and failed to:

      i.    determine whether each investor was properly accredited;

      ii.    ensure that each investor followed the "Subscription Procedures" described in the PPM;

      iii.    ensure that each investor executed a consent to be bound by the terms of Windy City Limo's Amended Operating Agreement;

      iv.    ensure that each investor paid at least the minimum purchase price for one Unit in the amount of $100,000.00;

      v.    identify each investor that was approved by the Manager to purchase half-Units;

      vi.    ensure that those investors approved by the Manager to purchase half-Units paid an amount equal to $50,000.00;

      vii.    file a Form D, Notice of Sale of Securities, within fifteen (15) days of the first sale of securities pursuant to the Offering; properly or adequately account for each subscription made pursuant to the Offering; and

      viii.    otherwise manage the Offering in a manner consistent with that of a registered broker-dealer.

101.    Jacobs, Sherman and Subeck, individually and through Windy City Manager, recklessly disregarded their obligation to disclose the Omissions prior to each investor making a subscription in Windy City Limo.

102.    Jacobs, Sherman and Subeck, individually and through Windy City Manager, intended for investors to rely upon the Misrepresentations and Omissions to cause the investors, including the Milazzos, to make investments in Windy City Limo.

103.     The Milazzos would not have made any of their investments in Windy City Limo

had they known that:

a.     the Offering Period would remain open indefinitely;

b.     Subeck and Sherman were not legally entitled to a commission in connection with each subscription;

c.     Subeck, Sherman and Jacobs would accept subscriptions for amounts less than $50,000.00;

d.     Subeck, Sherman and Jacobs were not qualified to or capable of managing the Offering;

e.     Jacobs would have unfettered control of the operation of Windy City Limo, Windy City Manager and JKS regardless of self-dealing or fraud;

f.     Jacobs would interfere with, and cause Windy City Limo and JKS to breach their respective obligations under, the JKS Letter Agreement;

g.     Jacobs would unilaterally encumber and/or waste the assets of Windy City Limo by causing Windy City Limo to enter into the Equipment Provision Agreement, the RBS Guaranty and the Lease Guaranty;

h.     Jacobs, Subeck and Sherman would create a competing company and would invest in WCBL, a company that ultimately replaced JKS as the exclusive vendor of vehicles for use in the operation of Windy City Limo;

i.     Jacobs would personally benefit, to the determent of the other members of Windy City Limo, by causing Windy City Limo to pay WCBL monthly lease rates that exceeded the amounts paid pursuant to the JKS Letter Agreement (as contemplated at the opening of the Offering);

j.     Jacobs and Subeck would enter into an agreement pursuant to which they rendered Sal's vote in Windy City Manager worthless;

k.     Jacobs would exercise veto power over the purchase and utilization of the BCI Buses to the detriment of Windy City Limo, Windy City Manager and JKS and for the sole benefit of WCBL;

l.     Jacobs would exercise complete autonomy in terminating Sal and Janet from their employment at Windy City;

m.     Jacobs would refuse to provide Sal and Janet, as members of the companies, with access to the books and records of Windy City Limo, Windy City Manager and JKS;

n.     Jacobs would unilaterally cause Windy City Limo operate BCI Buses that failed to conform to DOT standards;

o.     Jacobs would unilaterally cause Windy City Limo to operate BCI Buses in direct violation of a DOT direction to remove the buses from service until being brought into compliance with DOT standards; and

p.     Jacobs would endanger employee, public and customer safety by operating deficient and unsafe BCI Buses.

104.    The Milazzos did not know, and had no reason to know, that Jacobs, Sherman and Subeck had made the Misrepresentations and Omissions in the PPM and with respect to the Offering until they were advised by counsel of the same in connection with the instant pleading.

105.    Jacobs perpetuated the Misrepresentations and Omissions by requiring the Milazzos to make additional capital contributions to Windy City Limo, requiring Janet to sign the Equipment Provision Agreement on behalf of JKS and unilaterally encumbering Windy City Limo's assets.

106.    The Milazzos reasonably relied upon the PPM and Misrepresentations and Omissions by tendering their investments in excess of $500,000.00.

107.    The Milazzos lost other investment and business opportunities because they were fraudulently induced to participate and invest in Windy City Limo.

108.    The Milazzos were damaged as a direct and proximate result of the Misrepresentations and Omissions, equal to Sal and Janet's investment in excess of $500,000.00.

WHEREFORE, Plaintiffs, Salvatore and Janet Milazzo, pray that this Honorable Court:

A.     enter judgment in favor of Plaintiffs, Salvatore and Janet Milazzo, and against Defendants, George Jacobs, Stanton I. Subeck and Leonard Sherman, equal to Sal and Janet Milazzo's investment in the excess of $500,000.00; and

B.     grant such other and further relief as this Court deems just.

<u>**COUNT II**</u>
**Declaratory Judgment – Windy City Limo Operating Agreement**
**(*Sal individually and, derivatively on behalf of Windy City Limo v. Windy City Limo*)**

109.    Sal, derivatively on behalf of Windy City Limo, realleges and incorporates paragraphs 1 through 108 as though fully stated herein.

110.    In connection with the PPM and the Offering, Jacobs, Sherman and Subeck purportedly circulated the Amended and Restated Operating Agreement of Windy City Limousine Company, LLC (the "Windy City Limo Operating Agreement").  A copy of the Windy City Limo Operating Agreement is attached hereto as **<u>Exhibit 7</u>**.

*Procedural Unconscionability*

111.    Jacobs, Subeck and Sherman failed to disclose, and Sal never knew of or signed, the Windy City Limo Operating Agreement.

112.    Jacobs did not provide Sal, or any of the other investors, an opportunity to negotiate the terms of the Windy City Limo Operating Agreement.

113.    Jacobs encouraged the Milazzos not to retain separate counsel with respect to their investment in Windy City Limo, and instead suggested that the Milazzos utilize Windy City Limo's attorneys, which the Milazzos did.

114.    The Milazzos were never provided an opportunity to learn of or understand the meaning of the Windy City Limo Operating Agreement or the limitations it imposed upon their investment and ability to make decisions or influence company operations.

*Substantive Unconscionability*

115.    On information and belief, the Windy City Limo Operating Agreement was prepared at Jacobs' direction and instruction.

116.    The Windy City Operating Agreement purports to govern the ownership and operation of Windy City Limo.

117.    The Windy City Limo Operating Agreement was made for the purpose of and has the effect of:

  a.  permitting Subeck and Sherman to withdraw as the sole members;

  b.  vesting Jacobs with complete control over Windy City Limo, including whether, when and the purpose (such as taxes) for making distributions to the members;

  c.  limiting the investors right to compel distributions or other returns on their investments;

  d.  limiting the investors right to remove Windy City Manager as manager of the entity;

  e.  giving Jacobs sole control over Windy City Limo; and

  f.  prohibiting the investors from redeeming or otherwise liquidating their interests in Windy City Limo.

118.    Jacobs, as an issuer of the PPM and sole manager of Windy City Manager, failed to ensure that each investor consented to be bound by the terms of the Windy City Limo Operating Agreement.

119.    The Windy City Limo Operating Agreement is unconscionable in that it protects one member – Jacobs – to the detriment of the members, including Sal.

120.    Jacobs, Sherman and Subeck's conduct in connection with the PPM and the Offering, coupled with the prejudicial and economically harsh language contained in the Windy City Limo Operating Agreement, renders the Windy City Limo Operating Agreement unconscionable and unenforceable.

121.    Sal, individually and derivatively on behalf of Windy City Limo, has an inadequate remedy at law.

WHEREFORE, Plaintiff, Salvatore Milazzo, individually and derivatively on behalf of Windy City Limousine, LLC, prays that this Court enter an order:

A.     finding that George Jacobs, Stanton Subeck and Leonard Sherman engaged in oppressive conduct in connection with the PPM, the Offering, and in turn, the Windy City Limo Operating Agreement, and therefore procedurally unconscionable and unenforceable;

B.     finding that the Windy City Limo Operating Agreement is one-sided, economically harsh, and, therefore, substantatively unconscionable and unenforceable; and

C.     granting such further relief as this Court deems just and appropriate.

## COUNT III
### Purchase of Membership Interests – Windy City Limo
### (805 ILCS 180/35-60)
### (*Sal v. Windy City Limo*)

122. Sal realleges and incorporates paragraphs 1 through 121 as though fully stated herein.

123. As Sal is not bound by the Operating Agreement and/or the Windy City Limo Operating Agreement is deemed unconscionable and unenforceable, the LLC Act governs Windy City Manager (the manager) and Windy City Limo (the company).

124. Jacobs' conduct in connection with the PPM, the Offering, and the management of Windy City Limo, coupled with Jacobs' unilateral termination of Sal from his employment with Windy City Limo, has forced Sal's dissociation from Windy City Limo.

125. As a result of Sal's dissociation from the company, Windy City Limo is obligated to purchase Sal's distributional interest in Windy City Limo pursuant to Section 35-60 of the LLC Act for its fair value determined as of the date of Sal's forced dissociation.

126. Windy City Limo should be ordered to deliver a purchase offer to Sal as required by Section 35-60(b) of the LLC Act.

127.     Sal is entitled to and hereby commences this proceeding against Windy City Limo to determine the fair value of his distributional interest and to cause Windy City Limo to purchase his interest.  Alternatively, Sal hereby seeks to have this Court enter an judicial decree that Windy City Limo is dissolved.

128.     Sal is entitled to recover his attorneys' fees due to Jacobs' arbitrary, vexatious and bad faith conduct in connection with the PPM, the Offering and the ownership and operation of Windy City Limo.

WHEREFORE, Plaintiff, Salvatore Milazzo, prays that this Court:

A.     find that Salvatore Milazzo properly and justifiably dissociated from being a member of Windy City Limousine Company, LLC;

B.     determine the fair value, specify the terms of purchase, and require the assignment of Salvatore Milazzo's distributional interest in Windy City Limousine Company, LLC pursuant to Section 35-65 of the Act;

C.     order Windy City Limousine Company, LLC to purchase Salvatore Milazzo's distributional interest for fair value;

D.     order Windy City Limousine Company, LLC to pay for Salvatore Milazzo's attorneys' fees and costs due to George Jacobs' arbitrary, vexatious and bad faith conduct in connection with Salvatore Milazzo's investments in, and forced dissociation from, Windy City Limousine Company, LLC; or

E.     alternatively, enter a judicial decree that Windy City Limousine Company, LLC is dissolved, and commence the winding up of its business, for failing to purchase Salvatore Milazzo's interest as required by Section 35-60 of the Act; and

F.     grant such further relief as this Court deems just and appropriate.

### COUNT IV
**Judicial Dissolution – Member Expulsion**
**(805 ILCS 180/35-45(6))**
**(*In the Alternative to Counts II and III*)**
**(*Sal, individually and derivatively on behalf of Windy City Limo v.*
*Windy City Limo, Jacobs, LHS Ventures, Sherman and Subeck*)**

129.     Sal, individually and derivatively on behalf of Windy City Limo, realleges and incorporates paragraphs 1 through 108 as though fully stated herein.

130.    Section 35-45 of the LLC Act provides that "[a] member is dissociated from a limited liability company upon the occurrence of any of the following events:

> (6)    On application by the company or another member, the member's expulsion by judicial determination because the member:
>
>> (A)    engaged in wrongful conduct that adversely and materially affected the company's business;

131.    Jacobs, Sherman, individually and on behalf of LHS Ventures, and Subeck, should be expelled from membership of Windy City Limo because they engaged in wrongful conduct that adversely and materially affected the company's business, including:

> a.    permitting the Offering Period to remain open indefinitely;
>
> b.    accepting subscriptions for amounts less than $50,000.00;
>
> c.    causing Windy City Limo to pay unauthorized commissions to Subeck and Sherman;
>
> d.    failing to ensure that each investor followed the "Subscription Procedures" contained in the PPM;
>
> e.    failing to properly and adequately account for each subscription made pursuant to the PPM;
>
> f.    failing to manage the Offering in a manner consistent with that of a registered broker-dealer;
>
> g.    failing to hold any meetings for Windy City Limo, Windy City Manager or JKS;
>
> h.    causing Windy City Limo and JKS to breach their obligations under the JKS Letter Agreement;
>
> i.    organizing and operating WCBL and personally benefiting from the Lease Differential;
>
> j.    unilaterally encumbering the assets of Windy City Limo;
>
> k.    operating BCI Buses that failed to conform to DOT standards and risk public safety;

l.      operating BCI Buses in direct violation of a DOT direction to remove the buses from service until being brought into compliance with DOT standards;

m.     exposing Windy City Limo to contingent liabilities;

n.     unilaterally and intentionally decreasing the fair value of the membership interests in Windy City Limo;

o.     unilaterally terminating and forcing the dissociation of Sal and Janet, key employees and integral components to the success of Windy City Limo; and

p.     otherwise ignoring their fiduciary duties under the Act.

132.     Jacobs has acted and is likely to continue acting in a manner that is oppressive and fraudulent with respect to Sal and the other Class A members of Windy City Limo.

133.     Pursuant to Section 35-1 of the LLC Act, Jacobs, Sherman and Subeck's expulsion as members of Windy City Limo requires this Court to enter a judicial decree to dissolve Windy City Limo and wind up its business.

134.     This Court should appoint an interim manager or receiver to preserve the company's business as a going concern and/or to supervise the winding up of the company's business. The third-party manager or receiver should be ordered to audit the BCI Buses to ensure compliance with the DOT standards and Windy City Limo should be enjoined from operating any BCI Buses that do not strictly conform to the DOT standards.

WHEREFORE, Plaintiff, Salvatore Milazzo individually and derivatively on behalf of Windy City Limousine Company, LLC, prays that this Court:

A.     expel and dissociate George Jacobs, Stanton Subeck and Leonard Sherman, individually and on behalf of LHS Ventures Limited Partnership, from membership in Windy City Limousine Company, LLC;

B.     appoint an interim manager or receiver to operate and manage Windy City Limousine Company, LLC's business as a going concern;

C.      order the interim manager or receiver to audit the BCI Buses to ensure compliance with DOT standards;

D.      enter a preliminary injunction enjoining Windy City Limousine Company, LLC from operating any BCI Buses that do not strictly comply with DOT standards;

E.      in the alternative to subpart A above, enter a judicial decree that Windy City Limousine Company, LLC is dissolved, and commence the winding up of its business; and

F.       grant such further relief as this Court deems just and appropriate.

## COUNT V
### Declaratory Judgment – Windy City Manager Operating Agreement
(*The Milazzos, derivatively on behalf of Windy City Manager v. Windy City Manager*)

135.    The Milazzos, derivatively on behalf of Windy City Manager, reallege and incorporate paragraphs 1 through 108 as though fully stated herein.

136.    In connection with the PPM and the Offering, Jacobs and Subeck prepared the Amended and Restated Operating Agreement of Windy City Limousine Manager, LLC (the "Windy City Manager Operating Agreement").  A copy of the Windy City Manager Operating Agreement is attached hereto as **Exhibit 8**.

### *Procedural Unconscionability*

137.    On information and belief, the Windy City Manager Operating Agreement was prepared at Jacobs' direction and instruction.

138.    The Windy City Manager Operating Agreement purports to govern the ownership and operation of Windy City Manager.

139.    Jacobs named himself, Subeck and Sal each eight percent (8%) owners of the Class A membership interests in Windy City Manager.

140.    Jacobs did not provide the Milazzos an opportunity to negotiate the terms of the Windy City Manager Operating Agreement.

141.    The Milazzos were never provided an opportunity to fully understand the meaning of the Windy City Manager Operating Agreement or the limitations it imposed upon their ability to make decisions or influence Windy City Limo's operations.

142.    Jacobs encouraged the Milazzos not to retain separate counsel with respect to their ownership interests or execution of the Windy City Manager Operating Agreement, and instead suggested that the Milazzos utilize Windy City Limo's attorneys, which the Milazzos did.

### *Substantive Unconscionability*

143.    On information and belief, Jacobs and Subeck intentionally gave each Class A member an equal ownership interest, and in turn an equal voting right, for the purpose of giving Sal the false impression that he had the ability to impact the operation and management of Windy City Manager, which was the sole operator of Windy City Limo.  In fact, Jacobs and Subeck agreed to vote together on all matters, even if Sal objected, effectively rendering Sal's vote worthless.

144.    The Windy City Manager Operating Agreement, coupled with Jacobs and Subeck's agreement to vote consistently even in the face of Sal's objections, was made for the purpose of and has the effect of:

   a.    giving Sal the false impression that he has a meaningful vote with respect to Windy City Limo's operations and management;

   b.    vesting Jacobs with complete control over Windy City Manager and Windy City Limo, including whether, when and the purpose (such as taxes) for making distributions to the members of both companies;

   c.    limiting the investors right to remove Jacobs as the manager of the Windy City Manager;

   d.    permitting Jacobs and Subeck, over Sal's objection, to organize WCBL, force the parties to execute the Equipment Provision Agreement, and

profit from the Lease Differential to the detriment Windy City Limo and Windy City Manager; and

e.    otherwise permitting Jacobs, over Sal's objection, to unilaterally operate Windy City Limo and to encumber its assets to the determent of its members.

145.    The Windy City Manager Operating Agreement is entirely one-sided, favoring the company, Jacobs and Subeck, to the detriment of the members, including the Milazzos.

146.    Jacobs, Sherman and Subeck's conduct in connection with the PPM and the Offering, coupled with Jacobs and Subeck's agreement to nullify Sal's vote and the economically harsh language contained in the Windy City Manager Operating Agreement, renders the Windy City Manager Operating Agreement unconscionable and unenforceable.

147.    The Milazzos, derivatively on behalf of Windy City Manager, have an inadequate remedy at law.

WHEREFORE, Plaintiffs, Salvatore and Janet Milazzo, derivatively on behalf of Windy City Limousine Manager, LLC, pray that this Court enter an order:

A.    finding that George Jacobs, Stanton Subeck and Leonard Sherman engaged in oppressive conduct in connection with the PPM, the Offering, and in turn, the Windy City Manager Operating Agreement, and therefore is procedurally unconscionable and unenforceable;

B.    finding that the Windy City Manager Operating Agreement is one-sided, economically harsh, and, therefore, substantively unconscionable and unenforceable; and

C.    granting such further relief as this Court deems just and appropriate.

## COUNT VI
### Purchase of Membership Interests – Windy City Manager
### (805 ILCS 180/35-60)
### (*The Milazzos v. Windy City Manager*)

148.    The Milazzos reallege and incorporate paragraphs 1 through 108, and paragraphs 136 through 147, as though fully stated herein.

149.     As the Milazzos are not bound by the Windy City Manager Operating Agreement and/or the Windy City Manager Operating Agreement is deemed unconscionable and unenforceable, the relations among the members, Jacobs (the manager) and Windy City Manager (the company) are governed by the LLC Act.

150.      Jacobs' conduct in connection with the PPM, the Offering, and the management of Windy City Limo, coupled with Jacobs' unilateral termination of Sal and Janet from their employment with Windy City Limo, has forced Sal and Janet's dissociation from Windy City Manager.

151.     As a result of the Milazzos' dissociation from the company, Windy City Manager is obligated to purchase the Milazzos' distributional interests in Windy City Manager pursuant to Section 35-60 of the LLC Act for fair value determined as of the date of Sal and Janet's forced dissociation.

152.     Windy City Manager should be ordered to deliver purchase offers to Sal and Janet as required by Section 35-60(b) of the LLC Act.

153.     The Milazzos are entitled to and hereby commence this proceeding against Windy City Manager to determine the fair value of their distributional interests and to cause Windy City Manager to purchase their interests.

154.     The Milazzos are entitled to recover their attorneys' fees due to Jacobs' arbitrary, vexatious and bad faith conduct in connection with the PPM, the Offering and the ownership and operation of Windy City Manager.

WHEREFORE, Plaintiffs, Salvatore and Janet Milazzo, pray that this Court:

A.     find that Salvatore and Janet Milazzo properly and justifiably dissociated from being members of Windy City Limousine Manager, LLC;

B.      determine the fair value, specify the terms of purchase, and require the assignment of Salvatore and Janet Milazzo's distributional interests in Windy City Limousine Manager, LLC pursuant to Section 35-65 of the LLC Act;

C.      order Windy City Limousine Manager, LLC to purchase Salvatore and Janet Milazzo's distributional interests for fair value;

D.      order Windy City Limousine Manager, LLC to pay for Salvatore and Janet Milazzo's attorneys' fees and costs due to George Jacobs' arbitrary, vexatious and bad faith conduct in connection with Salvatore and Janet Milazzo's investments in, and forced dissociation from, Windy City Limousine Manager, LLC; or

E.      alternatively, enter a judicial decree that Windy City Limousine Manager, LLC is dissolved, and commence the winding up of its business, for failing to purchase Salvatore and Janet Milazzo's interests as required by Section 35-60 of the LLC Act; and

F.      grant such further relief as this Court deems just and appropriate.

## COUNT VII
### Judicial Dissolution – Member Expulsion
### (805 ILCS 180/35-45(6))
### (*In the Alternative to Counts V and VI*)
### (*The Milazzos, individually and derivatively on behalf of Windy City Manager v.*
### *Windy City Manager, Jacobs, Subeck and Sherman*)

155.    The Milazzos, individually and derivatively on behalf of Windy City Manager, reallege and incorporate paragraphs 1 through 108 as though fully stated herein.

156.    Section 35-45 of the LLC Act provides that "[a] member is dissociated from a limited liability company upon the occurrence of any of the following events:

(6)     On application by the company or another member, the member's expulsion by judicial determination because the member:

(B)     engaged in wrongful conduct that adversely and materially affected the company's business;

157.    Jacobs, Sherman, individually and on behalf of LHS Ventures, and Subeck, should be expelled from membership of Windy City Manager because they engaged in wrongful conduct that adversely and materially affected the company's business, including:

a.      permitting the Offering Period to remain open indefinitely;

     b.     accepting subscriptions for amounts less than $50,000.00;

     c.     causing Windy City Limo to pay unauthorized commissions to Subeck and Sherman;

     d.     failing to ensure that each investor followed the "Subscription Procedures" contained in the PPM;

     e.     failing to properly and adequately account for each subscription made pursuant to the PPM;

     f.     failing to manage the Offering in a manner consistent with that of a registered broker-dealer;

     g.     causing Windy City Limo and JKS to breach their obligations under the JKS Letter Agreement;

     h.     organizing and operating WCBL and personally benefiting from the Lease Differential;

     i.     unilaterally encumbering the assets of Windy City Limo;

     j.     exposing Windy City Limo to contingent liabilities;

     k.     operating BCI Buses that failed to conform to DOT standards and placed public safety at risk;

     l.     operating BCI Buses in direct violation of a DOT direction to remove the buses from service until being brought into compliance with DOT standards;

     m.     unilaterally and intentionally decreasing the fair value of the membership interests in Windy City Limo;

     n.     unilaterally terminating and forcing the dissociation of Sal and Janet, key employees and integral components to the success of Windy City Limo; and

     o.     otherwise ignoring their fiduciary duties under the Act.

158.     Jacobs has acted and is likely to continue acting in a manner that is oppressive and fraudulent with respect to the Milazzos and the other members of Windy City Manager.

159. Pursuant to Section 35-1 of the LLC Act, Jacobs, Sherman and Subeck's expulsion as members of Windy City Manager requires this Court to enter a judicial decree to dissolve Windy City Manager and wind up its business.

160. This Court should appoint an interim manager or receiver to preserve the company's business as a going concern and/or to supervise the winding up of the company's business. The third-party manager or receiver should be ordered to audit the BCI Buses to ensure compliance with the DOT standards and Windy City Limo should be enjoined from operating any BCI Buses that do not strictly conform to the DOT standards.

WHEREFORE, Plaintiffs, Salvatore and Janet Milazzo individually and derivatively on behalf of Windy City Limousine Manager, LLC, pray that this Court:

A. expel and dissociate George Jacobs, Stanton Subeck and Leonard Sherman, individually and on behalf of LHS Ventures Limited Partnership, from membership in Windy City Limousine Manager, LLC;

B. appoint an interim manager or receiver to operate and manage Windy City Limousine Manager, LLC's business as a going concern;

C. order the interim manager or receiver to audit the BCI Buses to ensure compliance with DOT standards;

D. enter a preliminary injunction enjoining Windy City Limousine Manager, LLC from operating any BCI Buses that do not strictly comply with DOT standards;

E. in the alternative to subpart A above, enter a judicial decree that Windy City Limousine Manager, LLC is dissolved, and commence the winding up of its business; and

F. grant such further relief as this Court deems just and appropriate.

## **COUNT VIII**
### **Declaratory Judgment – JKS Operating Agreement**
### (*Janet, derivatively on behalf of JKS v. JKS*)

161. Janet, derivatively on behalf of JKS, realleges and incorporates paragraphs 1 through 108 as though fully stated herein.

*Procedural Unconscionability*

162.    In connection with the PPM and the Offering, Jacobs prepared the JKS Operating Agreement.

163.    The JKS Operating Agreement purports to govern the ownership and operation of JKS, whose purpose is to acquire, own and operate limousines.

164.    Janet owns a one-third (1/3) membership interest in JKS.

165.    Jacobs did not provide Janet an opportunity to negotiate the terms of the JKS Operating Agreement.

166.    Janet was never provided an opportunity to fully understand the meaning of the JKS Operating Agreement.

167.    Jacobs encouraged Janet not to retain separate counsel with respect to her ownership interests or execution of the JKS Operating Agreement, and instead suggested that Janet consult with Windy City Limo's attorneys.

*Substantive Unconscionability*

168.    Although not permitted to do so by the JKS Operating Agreement, Jacobs exercised complete control over the operations and management of JKS, including:

    a.    whether, when and which vehicles would be purchased by JKS;

    b.    the terms on which JKS would "lease" the vehicles to Windy City Limo;

    c.    JKS's use of monthly lease payments paid by Windy City Limo;

    d.    whether, when and the amount of any expenditures made by JKS;

    e.    requiring that all profits of JKS shall be distributed entirely to Windy City Limo at the end of each fiscal year; and

    f.    forcing JKS to execute the Equipment Provision Agreement and to pay monthly lease rates to WCBL exceeding the rates paid to JKS pursuant to the JKS Letter Agreement.

169.    Jacobs has entirely ignored the salient provisions of the JKS Operating Agreement.

170.    Jacobs conduct in connection with the PPM and the Offering, coupled with Jacobs exercise of complete control over the management and operation of JKS, renders the JKS Operating Agreement unconscionable and unenforceable.

171.    Janet, derivatively on behalf of JKS, has an inadequate remedy at law.

WHEREFORE, Plaintiff, Janet Milazzo, derivatively on behalf of JKS Limousines, LLC, prays that this Court enter an order:

A.    finding that George Jacobs, Stanton Subeck and Leonard Sherman engaged in oppressive conduct in connection with the PPM, the Offering, and in turn, the JKS Operating Agreement rendering them procedurally unconscionable and unenforceable;

B.    finding that the JKS Operating Agreement was never enforced, is substantively unconscionable and unenforceable; and

C.    granting such further relief as this Court deems just and appropriate.

<u>**COUNT IX**</u>
**Purchase of Membership Interests – JKS**
**(805 ILCS 180/35-60)**
***(Janet v. JKS)***

172.    Janet realleges and incorporates paragraphs 1 through 108, and paragraphs 162 through 171, as though fully stated herein.

173.    As Janet is not bound by the JKS Operating Agreement and/or the JKS Operating Agreement is deemed unconscionable and unenforceable, the relations among the members and JKS are governed by the Act.

174.    Jacobs' conduct in connection with the PPM, the Offering, and the management of JKS, coupled with Jacobs' unilateral termination of Janet from her employment with Windy City Limo, has forced Janet's dissociation from JKS.

175.     As a result of Janet's dissociation from the company, JKS is obligated to purchase Janet's distributional interest in JKS pursuant to Section 35-60 of the LLC Act for its fair value determined as of the date of Janet's forced dissociation.

176.     JKS should be ordered to deliver a purchase offer to Janet as required by Section 35-60(b) of the LLC Act.

177.     Janet is entitled to and hereby commences this proceeding against JKS to determine the fair value of her distributional interest and to cause JKS to purchase her interest.

178.     Janet is entitled to recover her attorneys' fees due to Jacobs' arbitrary, vexatious and bad faith conduct in connection with the PPM, the Offering and the ownership and operation of JKS.

WHEREFORE, Plaintiff, Janet Milazzo, prays that this Court:

A.     find that Janet Milazzo properly and justifiably dissociated from being a member of JKS Limousines, LLC;

B.     determine the fair value, specify the terms of purchase, and require the assignment of Janet Milazzo's distributional interest in JKS Limousines, LLC pursuant to Section 35-65 of the LLC Act;

C.     order JKS Limousines, LLC to purchase Janet Milazzo's distributional interest for fair value;

D.     order JKS Limousines, LLC to pay for Janet Milazzo's attorneys' fees and costs due to George Jacobs' arbitrary, vexatious and bad faith conduct in connection with Janet Milazzo's investments in, and forced dissociation from, Windy City Limousine Company, LLC; or

E.     alternatively, enter a judicial decree that JKS Limousines, LLC is dissolved, and commence the winding up of its business, for failing to purchase Janet Milazzo's interest as required by Section 35-60 of the LLC Act; and

F.     grant such further relief as this Court deems just and appropriate.

## COUNT X
### Inspection of Business Records
### (805 ILCS 180/10-15)
### (*The Milazzos v. Windy City Limo, Windy City Manager and JKS*)

179.     The Milazzos reallege and incorporate paragraphs 1 through 91 as though fully stated herein.

180.     Section 1-40 of the Illinois Limited Liability Company Act (the "Act"), 805 ILCS 180/1-40, provides that:[2]

(a) Each limited liability company shall keep at the principal place of business of the company named in the articles of organization or other reasonable locations specified in the operating agreement all of the following:

(1) A list of the full name and last known address of each member setting forth the amount of cash each member has contributed, a description and statement of the agreed value of the other property or services each member has contributed or has agreed to contribute in the future, and the date on which each became a member.

(2) A copy of the articles of organization, as amended or restated, together with executed copies of any powers of attorney under which any articles, application, or certificate has been executed.

(3) Copies of the limited liability company's federal, State, and local income tax returns and reports, if any, for the 3 most recent years.

(4) Copies of any then effective written operating agreement and any amendments thereto and of any financial statements of the limited liability company for the 3 most recent years.

(b) Records kept under this Section may be inspected and copied at the request and expense of any member or legal representative of a deceased member or member under legal disability during ordinary business hours.

181.     Section 10-15 of the Act, 805 ILCS 180/10-15, provides that:

(a) A limited liability company shall provide members and their agents and attorneys access to its records, including the records required to be

_____

[2] The documents referred to in Section 1-40 of the Act are referred to herein as "Business Records."

kept under Section 1-40, at the company's principal place of business or other reasonable locations specified in the operating agreement. The company shall provide former members and their agents and attorneys access for proper purposes to records pertaining to the period during which they were members. The right of access provides the opportunity to inspect and copy records during ordinary business hours. The company may impose a reasonable charge, limited to the costs of labor and material, for copies of records furnished.

(b) A member has the right upon written demand given to the limited liability company to obtain at the company's expense a copy of any written operating agreement.

182.    Sal is a Class A member of Windy City Limo and has a right to inspect and review the company's Business Records.

183.    Sal is a Class A member, and the Milazzos are Class B members, of Windy City Manager and have a right to inspect and review the company's Business Records.

184.    Janet is a member of JKS and has a right to inspect and review the company's Business Records.

185.    The Milazzos have made several requests to inspect the Business Records maintained by Windy City Limo, Windy City Manager and JKS.

186.    Despite their repeated requests, both directly and through counsel, Windy City Limo, Windy City Manager and JKS have refused or otherwise failed to provide the Milazzos access to the Business Records.

WHEREFORE, Plaintiffs, Salvatore and Janet Milazzo, respectfully request that this Court enter an Order:

A.    compelling Windy City Limousine Company, LLC to permit Salvatore Milazzo to inspect and copy all Business Records maintained by the company pursuant to Section 1-40 of the LLC Act;

B.    compelling Windy City Limousine Manager, LLC to permit Salvatore and Janet Milazzo to inspect and copy all Business Records maintained by the company pursuant to Section 1-40 of the LLC Act;

C.   compelling JKS Limousines, LLC to permit Janet Milazzo to inspect and copy all Business Records maintained by the company pursuant to Section 1-40 of the LLC Act; and

D.   granting such further relief as this Court deems just and appropriate.

<u>**COUNT XI**</u>
**Breach of Fiduciary Duty**
(*Sal, derivatively on behalf of Windy City Limo v. Jacobs*)

187.   Sal, derivatively on behalf of Windy City Limo, realleges and incorporates paragraphs 1 through 108 as though fully stated herein.

188.   As the sole manager of Windy City Manager, Jacobs owes a fiduciary duty to Windy City Limo with respect to the day-to-day business operations and management of Windy City Limo.

189.   Jacobs breached his fiduciary duties to Windy City by, among other things:

a.   accepting subscriptions for amounts equal to less than $50,000.00;

b.   failing to ensure that all investors were properly accredited;

c.   properly or adequately accounting for each subscription made pursuant to the Offering;

d.   misusing the proceeds from the Offering;

e.   causing Windy City Limo to enter into the Equipment Provision Agreement;

f.   causing Windy City Limo to execute the RBS Guaranty;

g.   causing Windy City Limo the execute the Lease Guaranty;

h.   operating BCI Buses that failed to conform to DOT standards and placing the public safety at risk;

i.   operating BCI Buses in direct violation of a DOT direction to remove the buses from service until being brought into compliance with DOT standards;

j.   exposing Windy City Limo to a greater number of DOT inspections and out of service vehicles than the national average when compared to other

commercial carriers by running the deficient and dangerous BCI Buses; and

k.    causing Windy City Limo to pay WCBL lease rates that exceed the rates paid pursuant to the JKS Letter Agreement, resulting in the Lease Differential.

190.    Windy City Limo has sustained damages as a result of these breaches.

WHEREFORE, Plaintiff, Salvatore Milazzo, derivatively on behalf of Windy City Limousine Company, LLC, prays that this Court enter judgment in Windy City Limo's favor and against Defendant, George Jacobs, in an amount to be proven at trial, plus costs and punitive damages, and grant such further relief as this Court deems just and appropriate.

## COUNT XII
### Unjust Enrichment
### (*In the Alternative to Count XI*)
### (*Sal, derivatively on behalf of Windy City Limo v. WCBL, Jacobs, Sherman and Subeck*)

191.    In the alternatively to Count XI, Sal, derivatively on behalf of Windy City Limo, realleges and incorporates paragraphs 1 through 91 as though fully stated herein.

192.    WCBL has unjustly retained the benefit of the RBS Guaranty and the Lease Guaranty to the detriment of Windy City Limo and the members of Windy City Limo.

193.    WCBL, Jacobs, Sherman and Subeck have unjustly retained the benefit of the Lease Differential to the detriment of Windy City Limo.

194.    Windy City Limo has sustained damages.

WHEREFORE, Plaintiff, Salvatore Milazzo, derivatively on behalf of Windy City Limousine Company, LLC, prays that this Court enter judgment in his favor and against Defendants, Windy City Bus Leasing, LLC, George Jacobs, Stanton Subeck and Leonard Sherman in an amount to be proven at trial, plus costs, and grant such further relief as this Court deems just and appropriate.

Dated:  November 25, 2014                    Respectfully submitted,

                                             SALVATORE MILAZZO and JANET MILAZZO, individually and derivatively on behalf of WINDY CITY LIMOUSINE COMPANY, LLC, WINDY CITY LIMOUSINE MANAGER, LLC, and JKS LIMOUSINES, LLC,

                                             By:____/s/ Matthew C. Wasserman_____
                                                      One of their Attorneys

Margaret A. Gisch, Esq.
Matthew C. Wasserman, Esq.
Brianna L. Golan, Esq.
GOLAN & CHRISTIE LLP
70 West Madison Street, Suite 1500
Chicago, Illinois  60602
(312) 263-2300
Atty. No. 42399